IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NORTH CAROLINA
CHARLOTTE DIVISION
3:12-cv-724-GCM

| | |
|---|---|
| TARA Y. JONES, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **ORDER** |
| ) | |
| CON-WAY FREIGHT, INC., ) | |
| ) | |
| ) | |
| Defendant. ) | |

## I. INTRODUCTION

**THIS MATTER** is before the Court on Defendant Con-way's Motion for Summary Judgment (Doc. No. 37) and Memorandum in Support (Doc. No. 38), Plaintiff Tara Jones' Response in Opposition (Doc. No. 43), and Con-way's Reply (Doc. No. 49). For the reasons stated below, Defendant's Motion is **GRANTED**.

## II. LOCAL RULES

As a preliminary matter, the Court begins by noting that Plaintiff's Response in Opposition (Doc. No. 43) violates, in several respects, Local Rule 7.1(D). That Rule provides that, absent standing orders to the contrary, "the page limit for any brief is 25 pages, the font size is a minimum of 12 point, lines are double spaced, margins are one inch, and each page is numbered." Plaintiff's brief appears to be in a font smaller than 12 point with margins under one inch, and it also appears to be "compressed" such that the text is pushed closer together than normal. Otherwise, the brief is largely devoid of indentation—each section is just one paragraph, with some paragraphs spanning several pages. All this appears to have been done with the goal

of fitting as much text as possible on the allotted twenty-five pages, perhaps in the belief that this would strengthen Plaintiff's argument. In truth, the brief simply lends credence to the adage that more is not always better. The brief does not violate the rules in order to say something especially helpful or profound; instead, it is a wordy, disjointed, difficult-to-follow twenty-five pages ridden with typographical errors and incomplete (if not missing) citations. At many points throughout the brief, the Court is unable to determine what precisely Plaintiff means to say. Rather than strike the brief from the record, the Court will simply note that these rules are in place for a reason, and violating them does little more than frustrate the Court and court staff, who must grapple with non-conforming filings on top of the many pages of filings submitted in each case. In the future, however, counsel is warned that the Court will strike non-conforming briefs from the record and proceed to decide the matter as if no response had been filed.

### III. BACKGROUND

Defendant Con-way Freight, Inc. is a trucking company that operates throughout the United States and Canada. One of its many terminals is located in Charlotte, North Carolina, where Plaintiff Tara Jones worked as a truck driver from February 2007 until August 23, 2011. Con-way conducts random drug tests of its drivers who have, or are studying for, commercial drivers' licenses (CDLs). These tests are required by federal law and are governed specifically by the Federal Motor Carrier Safety Regulations (FMCSR), 49 C.F.R. Part 382, as well as regulations issued by the Department of Transportation (DOT), 49 C.F.R. Part 40. The company is required to test at least fifty percent of its workforce every year for illegal drugs and ten percent every year for alcohol.

Con-way employs an outside contractor, DSI, Inc., to make random selections of its employees for drug testing. (Declaration of Paul Frayer ¶ 4). The DOT regulations require that

employees who are randomly selected during each testing cycle must be tested unless they are on vacation or taking a leave of absence—in that case, the employee is excused from testing, but no other exceptions are allowed. *See* 49 C.F.R. Part 40. The regulations also require that the testing for drugs be done by urine specimen, which is sent to a laboratory. *Id.* The laboratory communicates the result of the test to Con-way's medical review officer (MRO), and not directly to Con-way. *Id.* If the result is negative, meaning no illegal drugs were found, the result is communicated to the MRO, who advises Con-way that the test was negative. *Id.* If the result is positive, or if the specimen has been tampered with, the laboratory informs the MRO, who contacts the employee to determine if there is some valid medical reason for the result. *Id.* The MRO then determines if the test should be ruled negative if there was a valid medical reason, or positive if there was not, and communicates only the final result to Con-way. *Id.*

In the event that the employee completely fails to provide a urine specimen, it is typically treated as a refusal to test. The employee has three hours from the time the test begins to produce the sample, and is urged to drink up to forty ounces of fluid to facilitate the process. 49 C.F.R. § 40.193. If the employee ultimately fails to produce a sufficient sample, it is provisionally considered a refusal. *Id.* From that point, the employee has five days to be evaluated by a licensed physician who is acceptable to the MRO. *Id.* The physician then sends his findings to the MRO, who determines if there was a valid medical excuse for the refusal. *Id.* If so, the MRO communicates to Con-way that the test was negative; if not, the MRO informs Con-way that the failure to test was simply a refusal. In the event of a verified refusal, Con-way is required to remove the employee from safety-sensitive duties. 49 C.F.R. § 382.211; 49 C.F.R. § 382.107.

Con-way's policy throughout Jones' term of employment was to discharge employees who had verified positive results or who were verified refusals. (Frayer Decl. ¶ 8). Con-way

made limited exceptions in states where employers were required to give employees a "last chance" before termination, but Con-way understands that North Carolina has no such policy. (*Id.*) Jones was first tested when she was hired in February 2007, and tested negative. (Declaration of Joni McCurdy ¶ 9). She was selected again in January of 2010 and tested negative then as well. (*Id.*) Jones was again tested in March 2011, and while it took her the full three hours to produce a specimen, she tested negative again. (Declaration of Aaron Mills ¶ 6). On August 11, 2011, Jones was selected for testing once more and was unable to produce a urine specimen within the three-hour window. (*Id.* ¶¶ 8-10). As required by DOT regulations, Con-way arranged for Jones to be evaluated by a physician within the five-day window. (Frayer Decl. ¶¶ 11-13). The following day, the MRO told Con-way that Jones was a verified "refusal," indicating that she had no valid medical excuse for failing to produce the specimen. (*Id.* ¶ 14). On August 23, 2011, Con-way terminated Jones' employment. (*Id.*)

Jones timely filed a charge of discrimination with the EEOC on December 20, 2011 alleging violations of Title VII of the Civil Rights Act of 1964 and the Americans with Disabilities Act (ADA) and received a Right to Sue notice on September 25, 2012. Plaintiff also received a Right to Sue notice from the North Carolina Department of Labor on July 2, 2012. On September 28, 2012, Jones filed suit against Con-way, alleging causes of action for violations of Title VII, the ADA, the Family and Medical Leave Act (FMLA), the Fair Labor Standards Act (FLSA), the North Carolina Wage and Hour Act (NCWHA), the North Carolina Retaliatory Employment Discrimination Act (REDA), Wrongful Discharge, and Negligent Infliction of Emotional Distress. (*See* Doc. No. 1 Ex. B). On August 20, 2013, with leave of the Court, Jones filed an Amended Complaint, adding claims for negligence and defamation (Doc. No. 40).[1] After

---

[1] In her Response, Jones also includes sections titled "Disparate Impact" and "Ratification." To the extent that Plaintiff means to assert these as additional claims outside the Amended Complaint, the Court finds that these

4

a period of discovery, Con-way filed the instant Motion on August 15, 2013 (Doc. No. 37). This matter is now ripe for disposition.

## IV. LEGAL STANDARD

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 47 U.S. 242, 248 (1986). The mere existence of a scintilla of evidence in support of the non-movant's position is not sufficient to establish a genuine dispute. *Id.* at 252. A material fact affects the outcome of the suit under the applicable substantive law. *See id.* at 248. When determining whether a dispute is genuine or a fact is material, courts are required to view the facts and draw reasonable inferences in the light most favorable to the party opposing the summary judgment motion. *Scott v. Harris*, 550 U.S. 372, 378 (2007). Unsupported speculation, however, is insufficient to defeat a motion for summary judgment. *Evans v. Techs. Applications & Serv. Co.*, 80 F.3d 954, 960 (4th Cir. 1996).

## V. DISCUSSION

The crux of Jones' claims stems from allegations that Con-way discriminatorily or retaliatorily selected her for drug tests and denied her a number of accommodations for an alleged "shy bladder" condition. As discussed below, the Court finds that these contentions are meritless.

**A. Failure to Accommodate under the ADA**

---

claims are not properly before the Court. Accordingly, the Court will only address the claims included in Plaintiff's Amended Complaint.

Jones' first cause of action is based both on Title VII and the ADA, and the Court will address them separately. Jones' ADA claim is premised on the assertion that she has a disability within the meaning of the ADA because she suffers from "shy bladder." Thus, she reasons, she was entitled to a number of accommodations including testing by alternate means, being allowed multiple attempts to test, being given more than five days to get an evaluation, or being allowed to take leave. At the very least, she argues, she should not have been terminated following the unsuccessful drug test.

In order for a Plaintiff to establish a *prima facie* case for failure to accommodate under the ADA, she must show (1) that she had a disability within the meaning of the statute; (2) that the employer had notice of her disability; (3) that with reasonable accommodation she could perform the essential functions of the position; and (4) that the employer refused to make such accommodations. *See Wilson v. Dollar General Corp.*, 717 F.3d 337 (4th Cir. 2013). Significantly, the ADA also provides that:

> It may be a defense to a charge of discrimination under this part that a challenged action is required or necessitated by another Federal law or regulation, or that another Federal law or regulation prohibits an action (including the provision of a particular reasonable accommodation) that would otherwise be required by this part.

29 C.F.R. § 1630.15(e). Here, Con-way disputes that shy bladder is actually a disability within the meaning of the ADA, but contends that, even if it is, Con-way can avail itself of 29 C.F.R. § 1630.15(e) because it was required to strictly comply with DOT regulations covering mandatory drug testing.

The DOT regulations make specific provisions for the failure of an employee to produce an adequate urine sample at 29 C.F.R. § 40.193.[2] Under this provision, employees are given

---

[2] This regulation is often referred to as the "shy bladder" regulation. *See Melman v. Metropolitan Gov't of Nashville*, 2010 WL 3063805, at *7 (M.D. Tenn. 2010).

three hours to produce a sufficient amount of urine for the sample. § 40.193(b). If the employee fails to produce a sufficient sample, she has five days to be evaluated by a licensed physician who has expertise in the medical issues raised by the failure to provide a specimen. § 40.193(c). The physician then makes a recommendation to the MRO as to whether the failure to produce the specimen was caused by a medical condition of the employee. § 40.193(d). The MRO must then seriously consider and assess the physician's recommendation before determining whether the employee had an ascertainable physiological condition or medically documented pre-existing psychological disorder, and relay those findings to the employer. § 40.193(e).

Con-way maintains that it correctly followed these procedures. Jones failed to produce a sufficient amount of urine within the testing window, and was referred to a physician within five business days of the unsuccessful test. (Mills. Decl. ¶¶ 8-10; Frayer Decl. ¶¶ 11-13). The physician determined that there was no documented pre-existing psychological or physiological explanation for Jones' inability to produce the sample. (Doc. No. 51 Ex. F). The next day, the MRO informed Con-way that Jones' failure to test was a verified refusal. (Frayer Decl. ¶¶ 14). Thus, Con-way asserts that it was required to remove Jones from her safety-sensitive position, and was well within its rights to employ its policy at the time and terminate Jones' employment.

Defendant also points to, and the Court finds instructive, *Melman v. Metropolitan Government of Nashville*, in which a Tennessee district court considered facts similar to ours. *See* 2010 WL 3063805 (M.D. Tenn. 2010). In that case, a bus driver was removed from his position after failing to produce a sufficient urine sample for a drug test pursuant to the same DOT regulations at issue here. *Id.* at *2. The employee underwent an examination, wherein the physician determined that he had a shy bladder condition that precluded him from producing a testable amount of urine. *Id.* The MRO, however, rejected the physician's determination and

7

informed the employer that the employee was a verified refusal. *Id.* In granting summary judgment for the employer on the plaintiff's ADA claim, the court noted that the MRO retains the discretion to disagree with the physician. *Id.* at *8. Finding that the employer had followed the DOT regulations as it was required to do, the court determined that 29 C.F.R. § 1630.15(e) offered the employer a complete defense to the ADA claim. *Id.*

Here, Con-way followed the same procedures required by the DOT regulations. The MRO informed Con-way that Jones was a verified refusal, and it removed her from her safety-sensitive position as it was required to do. It was under no obligation to entertain the accommodations that Jones requested after the fact, and in fact, largely could not entertain them given the specificity of the regulations. Jones further asserts that the regulations do not require that the employee be *terminated* after failing a drug test, and that Con-way should have engaged in an interactive process to consider reasonable accommodations. To this point, Con-way acknowledges that it was not required to terminate Jones, but asserts that its obligation to consider reasonable accommodations was never set in motion because Jones was evaluated by a physician who determined that there was no valid medical explanation for her inability to produce the sample.

The Court agrees. Con-way was required to follow a specific set of procedures under the DOT regulations such that it could not have reasonably accommodated Jones' requests for accommodation. As the court in *Melman* noted, "[r]equested accommodations that require a party to violate federal law cannot be reasonable." *Id.* at *10 (citing *E.E.O.C. v. Allendale Nursing Centre*, 996 F. Supp. 712, 718 (W.D. Mich. 1998)). The regulations specifically prohibit drug testing by means other than those prescribed. *See* 49 C.F.R. § 40.61(b)(3) (prohibiting testing "by catherization or other means"). Moreover, the regulation in question—29 C.F.R. §

8

40.193—seems to directly contemplate the "shy bladder" condition. The regulation calls for the employee to be evaluated by a physician to determine if there was some valid medical explanation for the failure to produce a sample. This Court agrees with the court in *Melman* that "[t]he ability for an employee with a valid medical reason for his inability to provide a sufficient sample to have his test cancelled and resume work obviates ADA . . . concerns." 2010 WL 3063805, at *10. The fact that Jones may have been later diagnosed with a shy bladder condition is irrelevant because Con-way was required only to have Jones evaluated by "a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a sufficient specimen." 49 C.F.R. § 40.193(c).

While the regulations did not require Con-way to terminate Jones' employment, it was Con-way's policy at the time to terminate employees who failed a drug test. (Frayer Decl. ¶ 8). Further, the regulations specifically provide that the decision whether to return an employee who has failed a drug test to a safety-sensitive position "is a personnel decision that you have the discretion to make." 49 C.F.R. § 40.305(b). Perhaps most importantly, Con-way is permitted to verify the need for a reasonable accommodation, and otherwise must be on notice of the employee's condition. *See, e.g.*, "Request for Reasonable Accommodation," Nos. 6-8, Enforcement Guidance: Reasonable Accommodation and Undue Hardship Under the Americans with Disabilities Act, *available at* http://www.eeoc.gov/policy/docs/accommodation.html. Here, Jones was examined by a physician who determined that she did not have a condition that might require an accommodation; thus, Con-way had no reason to believe that any accommodation was necessary.

Ultimately, it appears that Jones' termination was the result of Con-way's compliance with federal regulations and its own blanket policy toward drug tests. It had no reason to believe

that Jones required accommodation, and in fact had every reason to believe that she did not. The Court finds that there is no genuine issue of material fact on these points and that Jones has not established a *prima facie* case for failure to accommodate under the ADA.

### B. Sex and Race Discrimination under Title VII

Jones also alleges that her termination was the result of discrimination on the part of Con-way based on her race, her gender, or her sporadic complaints about workplace safety. Con-way maintains that the only reason for Jones' termination was her failure to pass the DOT-mandated drug test.

To establish a *prima facie* case of discrimination under Title VII, a plaintiff must show that (1) she is a member of a protected class; (2) she was qualified for her job and her job performance was satisfactory; (3) she suffered an adverse employment action; and (4) other employees who are not members of a protected class were retained under similar circumstances. *Bryant v. Bell Atl. Maryland, Inc.*, 288 F.3d 124, 133 (4th Cir. 2002); *Cook CSX Transp. Corp.*, 988 F.2d 507, 511 (4th Cir. 1993). Under the burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), if an employee proves a *prima facie* case of discrimination by a preponderance of the evidence, the employer has the burden of producing a legitimate, non-discriminatory reason for its actions. The burden then shifts back to the employee to show that the reason offered by the employer is just a pretext for discrimination.

The parties do not dispute that Jones is a member of a protected class or that she suffered an adverse employment action. Con-way does dispute, however, that Jones was satisfactorily performing her job because she failed a mandatory drug test and had to be removed from her safety-sensitive position. Jones asserts that she was singled out for drug testing as a result of discrimination or retaliation on the part of Con-way.

10

Con-way maintains that its selection of employees for drug tests is truly random and that it follows a strict and simple process. Joni McCurdy, Con-way's Designated Employer Representative (DER), uploads the names of all employees company-wide who have or are studying for CDLs into a system maintained by DSI, a company with which Con-way contracts to make random selections for drug tests. (McCurdy Decl. ¶ 3). The list contains no information about the race, sex, or other protected status of the employees. (*Id.*) DSI then randomly selects employees for drug tests based on methodology that Con-way does not know. (*Id.* ¶¶ 3-4). Once the selections are made, DSI notifies McCurdy that the selections are accessible. (*Id.* ¶ 3). McCurdy then goes into the system, obtains the names of the selected employees, and distributes the names to the relevant work sites. (*Id.*) Con-way maintains that it is not at all unusual for employees to be selected more than once in a twelve-month period, and that it exercises no influence whatsoever over DSI's selection of employees. (*Id.* ¶¶ 4-8). McCurdy has never asked DSI to select certain individuals or types of individuals for testing. (*Id.* ¶ 5). Jones admits that she has "no idea" how employees are selected for the drug tests. (Deposition of Tara Jones at 262-63).

After a thorough review of the record, the Court is persuaded that the selection process for employee drug tests is actually random and that Con-way did not "game" the system such that Jones' name was improperly selected. The Court has already established that Jones' failure to pass the DOT-mandated drug test was an acceptable reason to terminate her employment; thus, Jones has failed to demonstrate that she was performing her job satisfactorily and has failed to make out a *prima facie* case of discrimination.[3] Even if she had made out a *prima facie* case, Con-way's stated reason for terminating Jones—that it acted pursuant to DOT regulations and its

---

[3] The Court also notes that there is no evidence in the record that indicates other employees who are not members of a protected class were retained under similar circumstances.

own blanket policy toward drug tests—is a legitimate, non-discriminatory reason for her termination.

Apart from this analysis, Jones submits a spattering of incidents and one policy that she asserts is direct evidence of discrimination. The policy is Con-way's prohibition on tobacco use at its Charlotte service center—Jones asserts that the policy is only enforced as to smoking and not as to "chew" tobacco. This is evidence of discrimination because "whites chewed tobacco where the majority of black tobacco users smoked." (Def.'s Response in Opposition at 7). The Court finds this contention totally meritless. Jones does not dispute that this policy, as enforced, applied equally to all employees regardless of race, and at any rate, the Court is not persuaded that the manner in which Con-way enforces its tobacco-use policy is in any way indicative of racial prejudice. Otherwise, Jones contends that her termination was due in some way to a number of complaints she made about workplace conditions and a few minor injuries she sustained while working on the loading docks. To the contrary, Con-way maintains that Jones was in good standing right up until the evening of August 11 when she failed a drug test, and that this was the only reason she was terminated.

Again, the Court is persuaded that Jones was terminated based on Con-way's compliance with DOT-mandated drug tests and its own blanket policy with respect to those tests. Jones has produced no evidence which would indicate that the selection process for drug tests is not actually random, or that Con-way somehow influenced this process. The Court finds that there is no genuine dispute of material fact on these points, and that Jones cannot maintain a claim for discrimination under Title VII.

**C. Family Medical Leave Act**

Jones' next claim, packaged as her second cause of action, asserts that Con-way violated the FMLA by failing to provide her with leave under the FMLA for a "serious health condition," presumably for her "shy bladder" condition. Con-way asserts that shy bladder is not a serious health condition under the FMLA, and that Jones' FMLA claim is little more than a repackaging of her ADA claim.

The FMLA allows eligible employees to take job-protected, unpaid leave under some circumstances. 29 C.F.R. § 825.100. One of those circumstances is when the employee is suffering from a "serious health condition" that makes the employee unable to perform the essential functions of her job. *Id.* Under the FMLA regulations in effect in 2011, a "serious health condition" was defined as "an illness, injury, impairment, or physical or mental condition that involves inpatient care . . . or continuing treatment by a health care provider as defined in § 825.115." 29 C.F.R. § 825.113(a) (Dec. 16, 2008).[4] "Continuing treatment" included (1) two or more visits to a health care provider; (2) one visit to a health care provider plus a continuing course of treatment; (3) prenatal care; (4) treatment at least twice a year for a chronic condition that may cause a continuing or "periodic" incapacity; (5) permanent or long-term conditions such as a terminal illness; or (6) conditions requiring multiple treatments. 29 C.F.R. § 825.115.

Here, Jones does not appear to assert that she was incapacitated or unable to perform her job because of her "shy bladder" condition, or that she needed any type of continuing treatment such that she would need to take leave time. Thus, the Court is not persuaded that her shy bladder condition qualifies as a "serious health condition" under the FMLA. The Complaint appears to assert that Jones should have been given FMLA leave time instead of having to undergo the DOT-mandated evaluation within five days of her unsuccessful drug test, but the Court has already determined that Con-way was required to follow these time constraints. The

---

[4] New FMLA regulations took effect on March 8, 2013. *See* 78 Fed. Reg. 8834.

Court finds that there is no genuine dispute of material fact on these points and that Plaintiff cannot maintain an FMLA claim against Con-way.

### D. Wage and Hour Claims

Jones' third cause of action alleges that Con-way violated the Fair Labor Standards Act and the North Carolina Wage and Hour Act by failing to compensate her for the time that she spent undergoing drug tests. As previously discussed, Jones underwent three drug tests while employed at Con-way: January 22, 2010, March 22, 2011, and August 11, 2011. It appears, however, that Jones actually was compensated for this time—she admits that she was paid for the January 2010 test and does not dispute the testimony of Personnel Supervisor Aaron Mills that she was paid for the March 2011 test.[5] While Jones was not initially paid for the time spent in the August 2011 test, Con-way asserts that it retroactively paid her for this time on December 14, 2011. Beyond those facts, the Court is unable to determine the precise basis for Jones' FLSA and NCWHA claims. It does not appear from the evidence that Jones was not paid at least the statutory minimum wage, or that she was entitled to overtime. Thus, Jones cannot maintain claims under the FLSA or NCWHA against Con-way.

### E. Retaliation under REDA, Title VII, ADA, and FMLA

Jones also asserts a cause of action for retaliation under the North Carolina Retaliatory Employment Discrimination Act, as well as Title VII, the ADA, and the FMLA. As the Court

---

[5] Con-way notes that it did have a policy at the time of not paying employees for time spent in DOT-mandated drug tests, and that Aaron Mills told Jones that she would be docked pay for the three hours spent in the March 2011 test. It appears, however, that Con-way never actually deducted this time from Jones' pay. *See* Deposition of Aaron Mills at 125-27.

has already addressed Jones' claims under Title VII, the ADA, and the FMLA, it will focus on Jones' REDA claim.

In order to establish a *prima facie* case of retaliation under REDA, a plaintiff must demonstrate (1) that the employer was aware of the plaintiff's participation in a protected activity; (2) that an adverse employment action was taken against the plaintiff; and (3) that the two elements are causally related. *Wiley v. United Parcel Service, Inc.*, 102 F. Supp. 2d 643, 650 (M.D.N.C. 1999), *aff'd per curiam*, 11 Fed. App'x 176 (4th Cir. 2001). Notably, if the employee makes out a *prima facie* case under REDA, the employer can still prevail if it can show that it would have taken the same action in the absence of the protected activity. *Id.* (citing N.C. GEN. STAT. § 95-241(b)).

Broadly, Jones asserts that she "was a victim of ongoing and continuing retaliation from 2009 until the time she was terminated in 2011 after filing multiple complaints, injury reports, safety complaints, workers compensation claims, and threatening to go to external agencies." (Compl. ¶ 130). Con-way maintains, once more, that the only reason Jones was terminated was that she failed a drug test, and that she was in good standing with Con-way right up until that time. Con-way acknowledges that Jones did lodge complaints from time to time—for example, about the company's tobacco policy, or about a loading system the company was using to load its trucks—but found these complaints to be routine and unremarkable. It also acknowledges that Jones sustained minor injuries on two occasions and a more severe injury on a third occasion that resulted in her taking about three weeks off from work. Con-way maintains that these injuries were insignificant given the kind of work that Jones was doing and that it did not in any way motivate Con-way to seek Jones' termination. (*See* Doc No. 38 at 9-10). Certainly, it did not motivate Con-way to "game" the drug testing process. (*Id.*)

15

Once again, the Court is persuaded that Con-way terminated Jones because she failed a drug test that the company administered pursuant to applicable regulations and pursuant to its own blanket policies. Even if Con-way were unhappy about Jones' complaints and injuries, Jones has not established that these instances were causally related to her termination given the random process by which employees are selected for drug testing. Thus, Jones has failed to make out a *prima facie* case under REDA. Even if she had made out a *prima facie* case, the Court is also persuaded that Con-way would have terminated her in the absence of her "protected activity," again because of the failed drug test. Thus, Jones cannot maintain a claim for retaliation under REDA against Con-way. Jones' other assorted retaliation claims fail for the same reasons, as well as the reasons discussed in previous sections. *See* discussion *supra* Part V. A-C.

### F. Wrongful Discharge

Jones' fifth cause of action alleges that she was wrongfully terminated and that Con-way's actions violated the express public policy of North Carolina, namely the North Carolina Equal Employment Practices Act (EEPA), REDA, the FMLA, Title VII, and the ADA. (*See* Compl. ¶ 197). Jones' claim for wrongful termination fails largely for the same reasons that her claims under REDA, the FMLA, Title VII, and the ADA fail. To the extent that Jones alleges that she was terminated in retaliation for complaining about and EEPA-protected category, "there is no private right of action under North Carolina law for retaliation under [the EEPA]." *McLean v. Pattern Communities, Inc.*, 332 F.3d 714, 719 (4th Cir. 2003); *see also Mullis v. Mechanics & Farmers Bank*, 994 F. Supp. 680, 688 (M.D.N.C. 1997). Accordingly, Jones cannot maintain a claim for wrongful discharge against Con-way.

### G. Negligent Infliction of Emotional Distress

Jones' sixth cause of action asserts a claim for negligent infliction of emotional distress for her termination and because Con-way "negligently engaged in the conduct complained of." (Compl. ¶ 203). Under North Carolina law, an NIED claim arises when (1) a defendant engages in negligent conduct; (2) it was reasonably foreseeable that the conduct would cause the plaintiff to suffer severe emotional distress; and (3) the negligent conduct did indeed cause the plaintiff to suffer severe emotional distress. *See Wilkerson v. Duke Univ.*, 784 S.E.2d 154 (N.C. Ct. App. 2013). "Severe emotional distress" is defined as "any emotional or mental disorder, such as . . . neurosis, psychosis, chronic depression, phobia, or any other type of severe and disabling emotional or mental condition which may be generally recognized and diagnosed by professionals trained to do so." *Id.*

In her Response, Jones asserts that she "suffered extreme mental anxiety and depression due to her termination" and that "[s]ometimes paralysis sets in and all she does is cry." (Resp. at 18-19). However, there does not appear to be any evidence in the record to support Jones' claims or indicate that she suffers from severe emotional distress as it has been defined by North Carolina courts. Con-way also correctly points out that the "negligent" conduct that purportedly caused Jones' distress—failure to provide reasonable accommodations, discrimination, retaliation, wrongful discharge, wage and hour violations—necessarily involves *intentional* conduct. This Court has held that basing a claim for NIED on intentional conduct is untenable. *See Riepe v. Sarstedt, Inc.*, 2010 WL 3326691, at *4 (W.D.N.C. Aug 23, 2010). Accordingly, the Court finds that Jones has failed to create a genuine dispute of material fact on her NIED claim.

### H. Negligence

Jones' Amended Complaint also asserts a claim for negligence against Con-way. Once again, the Court struggles to determine the precise basis of Plaintiff's claim. The Complaint appears to allege that Con-way was negligent in the manner in which it conducted Jones' drug test, and otherwise makes vague assertions that Con-way violated a number of statutory and regulatory schemes without a focused discussion of the factual basis for these contentions. The Court has already discussed at length Con-way's drug testing procedures in this instance and found that there is no genuine dispute as to their adequacy under applicable regulations. *See* discussion *supra* Part V. A-B. In particular, Jones contends that she should have been evaluated by a urologist prior to her termination, but again, Con-way was required only to have Jones evaluated by "a licensed physician, acceptable to the MRO, who has expertise in the medical issues raised by the employee's failure to provide a sufficient specimen." 49 C.F.R. § 40.193(c). Based on the evidence in the record, the Court is unpersuaded that Con-way failed to accomplish this requirement and finds no genuine dispute.

For good measure, the Court will note once more that the conduct Jones complains of appears to be intentional rather than negligent conduct. *See* discussion *supra* Part V. G. Jones fails to point to any specific conduct on the part of Con-way that would give rise to a claim for negligence. Even if she had, it also appears that the statutory schemes upon which she relies cannot provide the basis for a negligence claim. Notably, the Surface Transportation Assistance Act, 49 U.S.C. § 31105 (STAA) provides an exclusive administrative remedy and cannot be asserted as a state-law negligence claim. *See Bailiff v. Davenport Transp., Inc.*, 2013 WL 6229150, at *3 (W.D.N.C. Dec. 2, 2013) (noting that there is no separate private right of action outside the scheme set forth in the STAA). North Carolina's Controlled Substance Examination Act specifically states that it does not apply to DOT drug tests. *See* N.C. GEN. STAT. § 95-235.

Finally, to the extent that Jones' claims are based on the Federal Omnibus Transportation Employee Testing Act of 1991 (FOTETA), there is no express or implied private right of action under that scheme, either. *See, e.g.*, *Parry v. Mohawk Motors of Michigan, Inc.*, 236 F.3d 299, 308-09 (6th Cir. 2000) (holding no private cause of action and noting specifically that the Act "does not evince a concern for the protection of drivers who believe that they have been aggrieved through the drug testing process"). Accordingly, Jones cannot maintain a claim for negligence against Con-way.

## I. Defamation

Jones' Amended Complaint also asserts a state law claim for defamation against Con-way because it "misrepresented Plaintiff's test results and sent the written information to the DOT and DMV knowing that the forms and information would transmit with negative information of and concerning Plaintiff and showing that Plaintiff refused a random drug test." (Compl. ¶ 268). In her Response, Jones contends that Con-way's internal communications about her test results were also defamatory. Con-way maintains that it has a duty to notify state CDL licensing authorities about all violations of DOT drug and alcohol testing rules, *see* 49 C.F.R. § 40.331(g), and at any rate, such communications would be subject to a qualified privilege under North Carolina law, *see Harris v. Procter & Gamble Manufacturing Co.*, 401 S.E.2d 849 (N.C. Ct. App. 1991). Moreover, Con-way asserts that the statements were all true, and that truth is an absolute defense to a defamation claim. *See Holleman v. Aiken*, 668 S.E.2d 579, 587 (N.C. Ct. App. 2008). Finally, Con-way notes that Jones' defamation claim is time-barred. At all times relevant to her claims, N.C. Gen. Stat. § 1-54(3) provided a one-year statute of limitations for

libel and slander claims. Jones' original Complaint was filed on September 28, 2012, more than one year after her termination and the alleged communication of her test results.

The Court finds persuasive and agrees with the arguments advanced by Con-way. The Court has already discussed the adequacy of Con-way's drug test and, based on the evidence in the record, finds that there is no evidence that it did not truthfully communicate the results of Jones' drug test. Jones also appears to have brought her defamation claim outside the applicable statute of limitations such that it is time-barred. Accordingly, Jones cannot maintain a claim for defamation against Con-way.

## VI. CONCLUSION

Based on the foregoing, **IT IS ORDERED** that Defendant Con-way's Motion for Summary Judgment (Doc. No. 37) is hereby **GRANTED**. The Clerk of Court is directed to close this civil case.

**SO ORDERED.**

Signed: March 20, 2014

*/s/ Graham C. Mullen*

Graham C. Mullen
United States District Judge